Jensen v. Clements, 14-1380. May it please the court, I'm Assistant Attorney General Marguerite Moeller, representing the Warden Marc Clements. This appeal of the District Court's Judgment in Order granting Jensen's habeas petition presents two issues for this Court's review. First, does Giles v. California qualify as clearly established federal law with respect to the forfeiture by wrongdoing component of Jensen's Confrontation Clause claim? And second, did the District Court accord the legal and factual deference to the Court of Appeals' finding of harmless error that AEDPA requires? When the State Trial Court admitted Julie Jensen's letter to police and some of her oral statements to Officer Cosman under the doctrine of forfeiture by wrongdoing, it was There the Wisconsin Supreme Court had adopted a broad version of forfeiture by wrongdoing, as had the majority of jurisdictions, to have considered the question prior to Giles, which was decided in 2008. Not until the Supreme Court in Giles held in a split decision that forfeiture by wrongdoing requires an intent to prevent the declarant from testifying, was the Wisconsin Supreme Court's holding implicitly overruled with respect to testimonial statements. And although the State, in Jensen's direct appeal, argued that even under Giles' version of forfeiture by wrongdoing, Julie's letter and statements should be admitted, the Wisconsin Court of Appeals declined to address that issue. The Court sidestepped the issue, saying it would leave that discussion for another day and instead it proceeded to the question of harmless error. In doing so, the Court engaged in a lengthy discussion of the evidence presented during Jensen's seven-week trial and concluded that any error in the introduction of Julie's letter and statements was harmless beyond a reasonable doubt under Chapman. Based on this chronology, it is Clement's position that the combination of Green v. Fischer and this Court's decision in Atkins v. Zank shows that Giles is not clearly established federal law with respect to the state court's decision on forfeiture. The last state court to address forfeiture was really the Wisconsin Circuit Court at Jensen's trial, when it found that he had forfeited the right to confront Julie. Would you agree that at the time the Wisconsin Appellate Court dealt with the appeal here, the case was still on direct review and under Griffith v. Kentucky, Giles was controlling law? I don't believe so, because I believe that Oh, Giles, excuse me, yes, under Griffith v. Kentucky, insofar as the merits of the forfeiture component of confrontation was concerned, he would be entitled to the benefit of that decision, that's correct. If the Wisconsin Court of Appeals had reached the merits and said, we don't think Giles prohibits the admission of this evidence, then we would evaluate whether that was a clearly unreasonable application, correct? That's correct. And if it had said, Giles does apply, but we think this is harmless, we would also apply a de-pedefrance to that, correct? No, if the court had found that Giles prohibited the introduction of the letter and statements, then my understanding is that this court would review that determination de novo, that de-pedefrance only goes one way. It only applies in situations where the state court had ruled in favor of the state. But then the focus would become the harmlessness issue, right? Or it could be both. If the state court had reached the question of whether Giles prohibited the introduction of those pieces of evidence, then the federal court could decide both whether that interpretation of Giles was correct, and then secondarily, it could also decide whether introduction of the evidence was harmless. Could you, Ms. Mueller, could you focus on the text of 2254D here and explain to me how we get from that the kind of mix and match of multiple state decisions? I think you get there by looking at both Greene versus Fisher. I asked about the text. I know you want to blend Greene and Atkins to do something that neither court did, but let's focus on the text. It talks about, and I don't have it right in front of me, but clearly established federal law at the time of the adjudication relates to, which adjudication are you referring to? And the- First to an adjudication of the claim on the merits. And the claim here is the Confrontation Clause claim, right? That is correct. Which was adjudicated on the merits by the Wisconsin Appellate Court by finding harmless error, right? That is correct. At least, Jensen's attorney and I agree with that. The United States Supreme Court apparently is going to consider that issue in Chappell versus Ayala, but we had agreed under precedent that yes, that would be a merits-based adjudication. And so just, and I know she'll get back to you, Judge Hill. I just wanted, so do you think we should hold this case until the Supreme Court decides that? I think if this court intends to address the harmless error issue, then it would be prudent, yes, to withhold a decision in this case until the court issues a decision in the Ayala case. Because that deals directly with whether the Ninth Circuit Court of Appeals correctly applied Brecht versus Abramson in looking at a harmless error determination that the California court had made. So there are parallels between- Well, let's go ahead and talk about that. We obviously have some cases that give some contrary signals concerning the relationship between Brecht and Chapman. Definitely. Under Adipa. How would that different approach make any difference here? I think the different approach would be if this court treated, and if the district court had treated, the Wisconsin Court of Appeals harmless error determination with the same type of deference that other state court adjudications on the merits receive, then the district court would not have started out by saying it was conducting a de novo or an independent review under Brecht versus Abramson. Instead, the court, as this court did, in Ashburn versus Cordy, which is a 2014 decision of this court, would have first asked whether the state court's harmless error determination was an unreasonable application. And Brecht is highly deferential as well, right? Brecht is the pole. So where do you, and the Supreme Court itself has said there's no difference here. So where's the difference? How could those analyses come out differently in this case? I think even though the Supreme Court said, I believe Justice Scalia in Frye versus Plyler that- For the court. For the court. Writing for the court, that the Brecht test subsumes Adipa-Chapman. That in practicality, that's not what's happening because there are cases that interpret Brecht versus Abramson. And one of them was a case that the district court cited, O'Neill versus McAninch, where the Supreme Court said that if a federal court has any grave doubts about whether or not a federal constitutional error was harmless, then it should grant relief. I think that result is contrary to ADPA deference as envisioned by Congress and as recently articulated by the United States Supreme Court. In cases like Harrington versus Richter, if there's doubt about whether something is harmful or harmless error, then under ADPA, the petitioner should not prevail. In this case, how would we, how could you reach a different result under those tests? I think that if the way Judge Griesbach did, looking at the whole record, he pretty much asked whether he had a reasonable, or grave doubt rather, about whether this was harmful or harmless error. He did not look at whether any fair-minded jurist could possibly disagree with or agree with the Wisconsin Court of Appeals three-judge determination that any error, if it occurred here, was harmless. Let's look, if we could, this is obviously critical, and I know your white light is on. I suspect we might be willing to give you some extra time here, given the weight of this case and the issues we're facing, and I'm sure for the other side as well. But I want to ask you to tell me what standard you think the Wisconsin Appellate Court was applying in finding that this was harmless, and let me just lay the foundation for that question. The court said a couple of times the jury could rationally have concluded that this was murder. Maybe that was a slip of the pen, but that sounds a lot like sufficiency of the evidence review, where all the evidence is reviewed in the light most favorable to the verdict. Contradictory evidence is basically discounted, and we ask, could a jury have convicted? That's, I think, completely the opposite of harmless error analysis under clearly established Supreme Court law. And then it's not, I think, just a slip of the tongue. What troubles me about this is I read through the Wisconsin Appellate Court's very detailed account of all of the state's evidence supporting its case, and I don't see any discussion, any engagement with the defense evidence, which impeaches that. All the problems with the medical evidence, the behavior the day before telling the neighbor, you won't see me, but don't worry about it, I'll be okay, and on and on and on. I don't see engagement. So it looks to me like the Wisconsin Appellate Court was actually applying a sufficiency of the evidence test rather than a harmless error test, but I'd ask you your response and comment. I think if you take those comments that you just cited from the court's opinion out of context, it does sound that way, but I think when you look at the opinion as a whole, the court examined several of the factors identified in Delaware versus Van Arsdell, including the strength of the state's case and whether the presumably inadmissible evidence was duplicated by or corroborated by other evidence. So this was not a situation- Where do we see the engagement? That's a sufficiency test. Where do we see engagement with the contrary evidence? I think the court does not have, in terms of habeas review under EDPA, I don't think the fact that the Wisconsin Supreme Court did not go through all of the contradictory evidence and- Let me add a little bit to that, too. What about the references to evidence being undisputed and uncontested and so forth? That seems to play into the concern Judge Hamilton expressed. And then the further statement that the record is replete with reason to uphold the jury's verdict, even if the assumed evidence is disregarded, without any reference to contrary evidence. I think the court was expressing its view that this was, upon having reviewed the entire record, which the court said it had done, its belief that there was overwhelming evidence presented by the state. It's true that the court did not set forth what it perceived to be contradictory evidence that the defense had presented. But in terms of this court's review, even if the state court had simply said, we find that any error is harmless beyond a reasonable doubt, and had engaged in no discussion whatsoever, that decision, terse as it may have been, would have been entitled to the same deference as- It would have, but having discussed some of the evidence, aren't we limited to that? Well, I think there's two alternatives. I mean, what I had argued in our reply brief is that the court, because it recognized what the various factors for judging harmless error are relevant, and then it proceeded to address some, but not all of those factors, that the statements that Judge Hamilton cited do not mean that they were conducting a sufficiency of the evidence test, because certainly, the Wisconsin Court of Appeals knows the difference between Chapman harmless error and a simple sufficiency of the evidence test. Alternatively, if this court were to find that the court unreasonably applied Chapman, then it would review the harmless error question independently, but it would still be required to give the presumption of correctness to the Wisconsin Court of Appeals implicit factual findings, because even where the court is not conducting deferential review under 2254D, the presumption of correctness under 2254E1 still applies, and I think set forth in both of our briefs- Are you contending that the undiscussed evidence, the defense evidence, was implicitly found to be incredible? Not all of it. I'm not incredible by any stretch of the imagination. I'm saying that if you look at the Wisconsin Court of Appeals' discussion on harmless error, there were a lot of implicit factual findings underlying the conclusion that the admission of the letter and statements was harmless beyond a reasonable doubt, and one of the most, I think, important implicit findings that the Wisconsin Court of Appeals made was that it was Mark Jensen and not Julie Jensen who conducted the searches for poisoning and other methods of murder on the Jensen's home computer, both in October of 1998 and who visited websites on ethylene glycol poisoning during the early morning hours of the very day on which Julie died. I think the court implicitly found that. Implicitly. And do you think that implicit finding was at all affected by the letter from the grave and that evidence that's subject to this dispute? So you're asking whether the Wisconsin Court of Appeals' finding was? Yeah. I would hope not. Well, we know that the medical evidence was affected by that, right? The state's doctors said they took that into account, right? I believe that the state's doctors, yes, did say that. With the new asphyxiation theory and so on at trial. Well, I think the asphyxiation theory did not so much depend on the letter. That came from the inmate, the inmate witness. Correct. Aaron Dillard. Because the opinions that were formulated by the various doctors, those opinions were formulated way in advance of the 2008 trial. On asphyxiation? No. That didn't come until we got the redirect, right, in trial? Right. I thought you were referring to the letter, though. And so, I mean, the opinions that the experts had furnished to defense counsel or to the prosecutor, depending on which side they were on prior to trial, those opinions were initially reached before the asphyxiation theory came up as a result of Aaron Dillard's testimony and Dr. Chambliss' testimony on redirect at the trial. Can you, I've got to say, counsel, I was looking at Dr. Long's report. He's an expert toxicologist, right? Correct. And he was off by a factor of nearly 300 on the quantity of ethylene glycol in Julie Jensen's stomach, correct? His initial report was way off, and that was something that the prosecutor admitted, though, right from opening statement at Mark Jensen's trial. That error was admitted, and it was dealt with. But you're right. It was definitely something that one would not expect from somebody who was an expert toxicologist. Something else that I'd like to talk about here in the harmless error analysis, if we could go back to that, because that really is so critical here. I haven't heard you talk about this, but before the conviction, going through the years of fights to get Julie's letter from the grave into evidence, the state repeatedly said how critical that evidence was, highly relevant to the central issues of this case, of extraordinary value, make or break. Those are the state's own phrases to describe that evidence. And it's easy to understand that. It's very hard to see how such explosive evidence could be harmless. I think with respect to those comments, at the time they were made, I think the prosecutor or the lead prosecutor believed that the letter was something that critical. But also, at that point, it wasn't sure, by any stretch of the imagination, whether a lot of evidence that eventually was admitted at Jensen's trial would come in. So. But he knew before the opening statement what was coming in, right? Not exactly. If you have read the transcript of this trial, it was incredibly contentious. And there were arguments throughout the trial about whether evidence, including evidence relating to what for want of a better term were computer pornography, whether that would be coming in. Yeah, but no, it was known that it was going to come in who did the computer search. Like that, a lot of the basic evidence the state had was known. Was known. And in fact, the letter was used in the opening statement when you talk about not knowing what was coming in. I mean, critical evidence was coming in, in terms of Mark, his searches on the computer. That evidence wasn't contested. No, the evidence about the computer searches was definitely ruled admissible. My point is that when the prosecutor. And a lot of the evidence that the state court relied on in its decision, that evidence was not contested. I mean, what was set out in their opinion, that hadn't been contested during the trial. I'm not sure which evidence you're referring to that was or was not contested. Certainly, the medical evidence was contested in terms of what, which opinion the jury would find. But in terms of like the circumstantial evidence surrounding the computer use, the circumstantial evidence wasn't contested. What was contested was which inference should we draw from the evidence about computer usage. So I think there's a difference in terms of, say, the medical evidence where you were actually getting different opinions from the various experts, as opposed to the computer evidence. The prosecutor was asking the jury to draw one inference. The defense attorney was asking them to draw a different one. And I think this. Yeah, but to me, that's different from evidence that's going to be admitted. You know it can be argued differently. Correct.  And I'm saying when the prosecutor stands up in opening statement and uses the letter, obviously feeling that the letter is critical, which is certainly in line with all the comments that were made when there were debates about whether the evidence would come in. The prosecutor knew their case at that time and understood the significance of the letter and used the letter in opening statement. He did do that. That is correct. And certainly, if I had been the prosecutor, given the choice of using it or not using it, I would have used it. But I don't think that that controls whether the Wisconsin Court of Appeals was acting unreasonably in finding that its admission was harmless under Chapman. Could you just, I guess, Ms. Mohler, articulate what standard of harmless error you think the Wisconsin Court of Appeals applied? I think they looked at all of the evidence and determined whether there was a reasonable doubt that had the presumably erroneously admitted evidence not been introduced. Was there a reasonable possibility of a different result? And they concluded no. So I think... Where did they articulate that standard? I think in the beginning of their discussion of harmless error, they cited Chapman and I believe that in citing Van Arsdell, they mentioned the various factors. I don't know if they specifically said what I just said when they concluded their discussion and decided that the admission of the letter and other oral statements was harmless. I don't have that right in front of me right now. We'll give you some time for rebuttal. And we'll add an additional five minutes to counsel's time as well. Thank you, Your Honors. Mr. Albee. May it please the Court. My name is Craig Albee. I represent the petitioner, Mark Jansen. As the district court found, Julie Jansen's letter and other statements to police were unrebuttable and emotionally compelling accusations of guilt. For that reason, the state spent enormous effort in admitting these statements at trial. As already mentioned, they characterized these statements as an essential component of the state's case, as a make-or-break issue, as being of extraordinary value. These statements were so important that the state took the matter to the Wisconsin Supreme Court to get the statements admitted. They were so important, they endured a 10-day evidentiary hearing to get the statements admitted. These statements, and especially the letter, permeated the trial of this matter. It was used during 12 witnesses, including five experts. And I think it's particularly important to look at how two of those experts used the letter. Dr. Long, in his report, it was two of the seven reasons he had for finding this was a homicide as opposed to a suicide, was the letter and the statements to police. And Dr. Mainland, the medical examiner. Some of the statements were determined to be non-testimonial, though, right? Not the statements to police. That is, Dr. Long, if I recall correctly, Dr. Long said reason number six is the letter that she wrote, and number seven is her other statements to police. And those statements to Officer Cosman through the voicemail, and then when he visited the Jensen home, were deemed to be testimonial, and I think even acknowledged as such before the Wisconsin Supreme Court by the state. So those were two of the seven reasons were those testimonial statements. And then Dr. Mainland said that every sentence in the letter influenced her determination that this was a homicide rather than a suicide. And she thought it particularly important that Julie had said in the letter that she would never take her life because of her kids. They are everything to me. And so if we have a medical examiner who's supposed to take a dispassionate,  and we have her taking into account this letter and those statements in forming a medical and scientific opinion, then how powerful would the same letter, these same statements be to a lay jury who has to assess the value of the evidence? You know, it is curious, though. They were out 30 hours, as powerful as the letter and statements were. It's still, it took the jury quite a while to reach a verdict. Which I think just goes to the harmfulness of this error. This is a very close case. And I think without the letter, the strong. I understand the letter was what, the second thing they asked for? Second thing they asked for. I think there'd be a very strong likelihood that they would have come back the other way. What was the first thing they asked for? Just out of curiosity. It's a pop quiz on the record. I'm sorry. I do not recall. But yeah, the 30 hours. I mean, what we have here at the end of the day is a very important piece of evidence as acknowledged by the state throughout their pretrial arguments. And a very close case. I mean, those are the combination of things that we usually see to find harmful error. When we look at the state appellate court decision, they went through all the other evidence at the trial against their client. And then they went line by line through the letter and found other evidence in the trial that made the same point or supported it. So on habeas review, isn't it hard for us to say the state court's reasoning is so out of line it can't stand? No, I don't believe so. There were significant differences between the statements that she made to the voice in Defazio. Significant differences in the credibility, I guess, that a jury might give to those statements. The statements, the letter in particular, is memorialized in writing. It's not subject to distortions of bias or memory. It wasn't subject to cross-examination. And on its face, it would appear rather coherent. We don't know what she was like or what frame of mind or how she was acting when she wrote it. But on its face, it would appear coherent. At the same time, the statements that we have to, for example, the neighbors and the teacher, she's contradictory. She's telling one person that Mark is controlling because he won't let me get a job. She's telling the other person he's controlling because he demands I get a job. She says he's controlling because he wants my son in daycare. He's controlling because he doesn't want my son in daycare. He's always leaving the computer on so I see it. He's always covering the computer up. I mean, we have these diametrically opposed versions of events that she's giving to other people and so there'd be reasons to reject her credibility in assessing those statements. We also have a lot of unusual behavior associated with her statements that she's giving to the Voights and DeFazio. We have unusual things that those witnesses are reporting. For example, Mr. Voight tells this story that seems ingrained in his mind about seeing her being very pregnant. Mr. Jambois, in his offer of proof, suggested she was eight months pregnant. Mr. Voight says she's very big and working on this deck and he remembers it's summertime and she's being forced to work on this deck and we're able to prove through building inspector records and the birth date of the son that it's just not possible that any of that could have happened as he described it. In terms of Ms. DeFazio, she has a flashback that this note that she wrote about having a cold the day before her death, she has this flashback about it being printed and not incursive like Julie always used, suggesting that maybe somebody else wrote this letter. But of course, the letter is printed. It's not incursive. So this flashback is completely wrong. We also have Julie omitting important information to, for example, Ms. DeFazio. She's not telling her, the Voights, that she's going to see Dr. Borman or that she's depressed. She mischaracterizes the counseling she had had in 1991 to Ms. DeFazio by saying it was over the affair and that it was marriage counseling and that Mark was making up stories about her. But we had Mr. DeFazio, the psychotherapist, testify and that wasn't true. She went in on her own and Mark wasn't making up stories. It was her counseling and so that wasn't about the affair. It was about her major depressive disorder, just as it was at the time of these events. So we have a lot of differences and a lot of reasons why the jury could reject those statements to Voight and DeFazio, whereas the letter just has so much more power and serves as a roadmap. And being in writing and memorialized and being able to go back to it and show it and being an exhibit that they asked for, I think would have a lot more power than you'd ever see from these statements that were partially subject to cross-examination, at least under the circumstances in which they were given, and which exposed a lot of credibility problems for Julie Jensen. As the Supreme Court pointed out in Brecht and this Court pointed out in Jones, the issue is not just whether there's enough evidence to support the result, but whether the jury be influenced based on the entire record. And I think that does go to one of the problems here and why this was an unreasonable application of Chapman, is the Wisconsin Court of Appeals did apply a sufficiency of evidence test. We cited the three different times during the opinion that they used language that would be consistent with a sufficiency of evidence test and not a harmless error test. And then their analysis of the evidence is all about how the evidence would support the verdict. And of course that's not the issue. They never discuss what would have been the effect of this evidence on the jury. And so, I mean, I think this Court can just simply find this to be an unreasonable application of Chapman because they used the sufficiency of the evidence. Then we get past all the issues that may or may not exist regarding Brecht. And then the other thing that was unreasonable was that they called certain evidence undisputed when it wasn't. And the complete failure to discuss the defense evidence, which was substantial in this case. Now let me ask you this. In terms of the case that's pending before the Supreme Court chapel, do you think we should hold a decision on this case until the Supreme Court decides that? Or do you think it will have an impact on this case? I don't think the case should be held. I mean, I guess, first of all, it would be my request and I think appropriate to find an unreasonable application of Chapman based on the sufficiency of the evidence, in which case there's no disagreement that the Court would then have to apply Brecht. And I don't see how the, I can't remember who's left in it, Ayala or Wong, but that case wouldn't come into play. I think apart from that, Frye is clear and so is, and Jones adopts Frye, that Brecht is a deferential standard of review. It's much harder to make than the Chapman beyond a reasonable doubt. I mean, to say that this letter was harmless beyond a reasonable doubt, I mean, beyond a reasonable doubt is a really high standard to me. And to say beyond a reasonable doubt it's harmless, that is unreasonable if you can meet the Brecht, if you can meet the Brecht standard. And so I think for the reasons given in Jones and Frye, it's subsumed. So if you meet Brecht, you've shown an unreasonable application of Chapman. The State's brief ignores all the other ways in which evidence can infect a jury. And the question is, was there a substantial and injurious effect on this jury? And certainly you have to consider the emotional weight of this letter. You have to consider its power as a narrative device. As we suggested in the brief, a screenwriter who is pitching the Jensen trial as a movie would start out with the letter. It's memorable, it's powerful, it's interesting. That voice from the grave stuff, it is compelling. And the State recognized that. That's why it was such an essential component and why the State was able to use it as the roadmap in this case and use it emotionally with the jury. And I think as Judge Hamilton suggested, we also have to consider how it affected the jury's evaluation of other evidence. There was a lot of evidence here where both sides presented evidence or both sides asked the jury to draw different inferences from the same evidence. And undoubtedly, the letter and her other statements to police would affect the evaluation of that evidence. Mr. Albee? Mr. Albee, both you and Ms. Moeller know this case on the record better than we do, much better I'm sure. What I kept looking for from either side was evidence that really could not be disputed or impeached that would differentiate between these two very dark theories, either the murder set up to make it look like suicide or the suicide set up to make it look like murder with all kinds of plotting and planning on one side or the other. And the evidence of the timing of the computer searches, not just on December 3rd, but really all of them, looked like pretty strong evidence for the State in that respect. Could you address that in terms of the harmless error analysis? The State's case, and in particular with regard to the computer evidence, was circumstantial. From all the evidence presented, both of them likely were at home or could have been home at the time of various computer searches. Certainly there were searches that we contended strongly suggested Mrs. Jensen, such as at the same time there was searches or I can't remember if there was a sign up for a suicide news group at the same time the first search for Ethelene Glycol took place. There was the day before her death, there's computer search at 945 on December 2nd. Mrs. Voigt says that right around that time, Mrs. Jensen calls, says, don't worry about me, you won't see me outside, nothing to worry about, she's discouraging help. And Mrs. Voigt says that that call comes right after Mark Jensen leaves. And I think it's completely reasonable for the jury to infer that when Mark leaves, she acts to put in place her plan to kill herself, which is call Mrs. Voigt, who might meddle in this matter, and also be on the computer and see what's going on, and that that happens after Mark leaves. The evidence is, she says at trial 10, she acknowledges that she's previously said it could be at 930, there'd be no reason why nine years later a jury should be willing to put a lot of stock in either one, other than it's all around the same time, the telephone call and the Jensen thing. One piece of computer evidence that I think is overstated in the state's brief, as well as in the Court of Appeals opinion, is there's the, I think it's October 16th, and there are some searches for, the suspicious kind of searches for either poisoning or bombs or something like that, that take place just after midnight on October 16th. So let's just say 12 or 2 a.m., it goes for a little while. And then I think again at, say, 10 p.m., there's some other searches on the home computer. And what the Wisconsin Court of Appeals does is try to say, is try to suggest that at the same time there's emails between Kelly and Mark about their relationship. But those take place on a different computer, Mark's work computer. They take place during the day, I think about 9, 30, 10 in the morning. They're not at all the same time. They're not on the same computer. And I think that's another important fact that was really helpful to the defense, is that they get his work computer from St. Louis that had gone down there. They get his other work computers. There's nothing suspicious on those computers. And despite the suggestion of, for example, Dave Nearing, that perhaps he was trying to destroy some evidence on the computer, there's no evidence of that either. They present absolutely nothing that shows he's doing any of these kind of searches at work, which you would expect. It's the same argument that the state makes with respect to Julie Jensen that you'd expect her to do it during the day. You'd expect Mark Jensen to be doing that same kind of thing at work as well. So at the end of the day, you can draw the inference either way as to who is using that computer. There's no firm evidence as to who's using it. Our experts established that she could have been using it all the way up until the time of her death, based on her medical condition. We also know from her medical condition that even though nobody knew she was eating, she had food in her stomach, which showed she was eating. The bed wasn't soiled, which showed she was going to the bathroom. And we know that she was making the telephone calls. So the inference could be drawn either way. And I think that's where, again, the letter becomes especially harmful, because trying to evaluate that, and even in her letter she says, Mark's an avid surfer of the internet. That letter comes into play in the jury's evaluation, and it's just yet another substantial and injurious way in which it affects the case and the jury's evaluation of the case. There's some discussion about the medical evidence during early argument, and this was an especially weak part of the state's case. Dr. Long, this idea that there was a belly full of ethylene glycol, that was pointed out by defense experts. So yes, by the time of trial they knew that, but only because defense experts had pointed it out. The original medical examiner was fired over a dispute with the prosecutor in this very case. And then by the time you get to the forfeiture hearing, you have Dr. Mainland just four months from trial, about nine years after the death, and she still says the death is because of ethylene glycol. There's still no suffocation theory. And you would just expect that this would be the most important thing for the state to settle on early on. What is the cause and manner of death? They relied on Dr. Long. That was wrong. They charged it ten days after his report. And then at that forfeiture hearing, Dr. Mainland says she would have been too weak on December 2nd to even make a telephone call. Well, there was objective evidence through Mrs. Voigt that she made that telephone call, and so that further called into question all of her testimony and opinions. And then we have the off-the-cuff on redirect opinion from Dr. Chambliss, who has not reviewed the case, hasn't looked at police reports, is shown some pictures and asked to make an on-the-spot determination as to what happened. And he knows almost nothing about ethylene glycol poisoning. His opinions are contrary to all the other experts in the case, including the states. And frankly, I don't think that he should have even been allowed to give an opinion because of his lack of qualifications to do so and the fact that there hadn't been notice. But this was an especially weak part of the case. By contrast, the defense brought in Dr. Rumack, who explained exactly how she could have been functioning and using the computer and doing other things throughout this period. And then, of course, there's the mental health evidence, which was very strong for the defense. In this case, including Dr. Spiro's report, where he explained, after going through a very in-depth evaluation, talking to people who knew Julie, that he thought she had delusional features in addition to her major depressive order and that there were a lot of risk factors for suicide here in this case. Ethylene glycol seems like a pretty odd choice for somebody who's trying to commit suicide to make it look like murder. Because it's not going to be checked routinely, right? I'm not sure any average person would know what gets checked or what doesn't get checked or anything else. The fact is we had introduced in evidence that the Kenosha County Medical Examiner's Office had recently, I think during the pendency of the case, had had someone commit suicide with ethylene glycol. There was no dispute that that had taken place. My recollection is that Dr. Mainland testified that more often ethylene glycol is a suicide rather than an instrument of homicide. Very hard to administer a lethal dose without somebody realizing it. Yes. Yes. And Dr. Spiro really emphasized that fact as well. If she was in that sort of state of mind to get her to take something when she said she wasn't eating at the house, it would have been extremely, extremely difficult. I see I'm out of time unless there are any additional questions. All right. Thank you. Thanks. Two minutes Ms. Mullen. Just briefly. In terms of the impact of the letter, I think what this court has to keep in mind is that even if the letter itself had been not admitted at the trial, this would not have prevented any of the experts from relying on it as a basis for their opinion on whether Julie Jensen's death was a homicide versus a suicide. Obviously the jury might not have learned any of the details of the letter, but in terms of the import of their opinion, they would be able to consider it. That's basic under Wisconsin evidence code that even if something is, say, inadmissible hearsay, it does not mean it can't be the basis for an expert opinion. But doesn't the court have to also weigh prejudice versus probative value? Yes. It's possible that that could still be taken into account in the expert opinion, but that if someone opposed that and said it shouldn't be in the game, period, shouldn't be part of any kind of, even if an expert did rely on it, you're saying it could never be improper for an expert to rely on it. I'm saying there could be an argument made that prejudice outweighs probative value even if you get over to hearsay, huh? Right. I would respectfully disagree with whether they could rely on it. I think the expert can always rely on something that is customary for them to look at, but in terms of- Yeah, but what I'm saying is, but that may be true, and I agree with you generally speaking. Experts can basically rely on anything. But I think the trial court, if a motion is made, could argue, could look at prejudice versus probative value. Right. The trial court- So why not? Right. The trial court could definitely keep out any of that information from the jury's- From the opinion. Does Dr. Mainland have any expertise in evaluating suicide notes? Not that I'm aware of. I mean, we say all the time that experts can rely on inadmissible material, that it's ordinary and customary for them to rely upon in reaching their professional judgments. But this one really seems extraordinary. For her to rely on, to assume that that letter is genuine when that is the key issue in dispute in the whole trial, the whole opinion winds up seeming circular. But I think if you looked at the testimony of Dr. Denton, one of the defense's experts, Dr. Denton relied on the letter to prove or to help him reach the conclusion that her death was a suicide because he felt that the letter was very contrived. So I think that experts on both sides of the aisle- That sounds like a good reason for another trial. Took different viewpoints. So I see my time is up. I'd ask the court to reverse the district court's decision and remand so that the district court can address the question of judicial bias that remains unresolved. Thank you. Thank you. Thank you both, counsel, for your fine arguments and your briefs. We'll take the case under advisement.